## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| LEEROY PERKINS; MARCIA JACOBS; JOSE ANTONIO KOCH; JOHN DOE, a Minor, through his Guardian, JOSE ANTONIO KOCH; and JAMES DOE, a Minor, through his Guardian, JOSE ANTONIO KOCH *on behalf of themselves and all others similarly situated*, ) ) ) ) ) ) ) | Case No. 1:22-cv-07313<br><br>Hon. Harry D. Leinenweber |
| Plaintiffs, ) ) | **JURY TRIAL DEMANDED** |
| v. ) ) | |
| COMMONSPIRIT HEALTH, ) ) | |
| Defendant. ) ) ) | |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Leeroy Perkins, Marcia Jacobs, Jose Antonio Koch, John Doe, a Minor, though his guardian, Jose Antonio Koch, and James Doe, a Minor, through his guardian Jose Antonio Koch (collectively, "Plaintiffs") bring this Consolidated Amended Class Action Complaint, on behalf of themselves and all others similarly situated, against Defendant CommonSpirit Health ("CommonSpirit" or "Defendant") alleging as follows based upon information and good faith belief and due investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge:

## <u>NATURE OF THE ACTION</u>

1. Information about a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have extremely serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.

1

2. Healthcare providers that handle personally identifying information ("PII") or protected health information ("PHI" and together with PII, "Private Information") have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential and personal information entrusted to them.

3. This duty exists because it is foreseeable that the exposure of such Private Information to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, medical and financial identity theft, invasion of their private health matters and other long-term issues.

4. The harm resulting from a data and privacy breach manifests in several ways, including identity theft and financial and medical fraud, and the exposure of a person's Private Information through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.

5. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time, money and other resources to closely monitor their credit, financial accounts, health records and email accounts, as well as to take a number of additional prophylactic measures.

6. In this instance, all of that could have been avoid if CommonSpirit—which is the second-largest health system in the United States, operating 140 hospitals and over 1,000 care sites across 21 states—had employed reasonable and appropriate data security measures.[1]

---

[1] *See* Bill Toulas, *CommonSpirit Health Ransomware Attack Exposed Data of 623,000 Patients*, Bleeping Computer (Dec. 8, 2022), https://www.bleepingcomputer.com/news/security/commonspirit-health-ransomware-attack-exposed-data-of-623-000-patients/.

7.     As a healthcare provider covered under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq.* ("HIPAA"), CommonSpirit knowingly and intentionally obtains sensitive patient PII and PHI, and pursuant to regulatory, statutory and common law has a duty to securely maintain such information in confidence.

8.     On December 1, 2022, CommonSpirit began to notify its patients at a few of its affiliated entities (specifically, Franciscan Medical Group/Franciscan Health and Virginia Mason Franciscan Health in Washington State) that their Private Information stored on its systems had been compromised by a ransomware attack which took place over a two-week span between September 16 and October 3, 2022 (the "Data Breach").[2]

9.     On the same date (December 1, 2022), CommonSpirit reported the Data Breach to the Department of Health and Human Services Office for Civil Rights ("HHS"), indicating that more than 623,000 individuals had their Private Information breached.[3]

10.     At *that* time, CommonSpirit indicated that the information impacted by the Data Breach included names, addresses, phone numbers, dates of birth and unique IDs used internally by CommonSpirit of patients, family members of patients and caregivers of patients.[4]

---

[2]     *See* https://www.commonspirit.org/notice-of-data-security-incident (last visited April 20, 2023); *see also CommonSpirit Health Provides Cyberattack Update and Notification of Data Breach Involving Virginia Mason Franciscan health In Washington State*, PR Newswire (Dec. 1, 2022), https://www.prnewswire.com/news-releases/commonspirit-health-provides-cyberattack-update-and-notification-of-data-breach-involving-virginia-mason-franciscan-health-in-washington-state-301691982.html.

[3]     *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Dep't of Health & Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Apr. 19, 2023).

[4]     *Id.*

11. However, the Data Breach was much larger and involved much more sensitive information than CommonSpirit initially reported.

12. On February 9, 2023, CommonSpirit began to notify individuals at one of its joint ventures, St. Luke's Diagnostic Cath Lab, Diagnostic Heart Center ("DHC"), that their personal information had also been compromised during the Data Breach.[5]

13. At *this* point, CommonSpirit indicated the information impacted by the Data Breach also included "personal information of some patients, patient guarantors, and some staff or credentialed practitioners of DHC."[6]

14. Following the February 9, 2023 "update," CommonSpirit thereafter issued a second "update" on April 6, 2023, this time informing patients at its affiliated entities, Catholic Health Initiatives, Dignity Health, Centura Health and MercyOne, that their Private Information had *also* been compromised during the Data Breach.[7]

15. As part of this third notice regarding the very same Data Breach that occurred in October of 2022, CommonSpirit now indicated that the Data Breach impacted the Private Information of patients at more than 164 CommonSpirit hospitals and care sites around the country.[8]

---

[5] *Notice of Data Security Incident*, CommonSpirit, https://www.commonspirit.org/notice-of-data-security-incident (last visited Apr. 20, 2023).

[6] *See id.*

[7] *Id.*

[8] *CommonSpirit Health Issues Update Confirming 164 Facilities Affected by Ransomware Attack*, HIPAA Journal (Apr. 10, 2023), https://www.hipaajournal.com/commonspirit-health-issues-update-confirming-164-facilities-affected-by-ransomware-attack/#:~:text=CommonSpirit%20Health%20reported%20the%20data,many%20individuals%20have%20been%20affected.

16.     Thus, *despite discovering the Data Breach on or around October 2, 2022*, CommonSpirit did not disclose the full scope of the Data Breach or the information impacted, until on or about April 6, 2023, *over six months after the fact.*

17.     Based on the public statements of Defendant to date, a wide variety (and substantial amount) of PII and PHI was implicated in the Data Breach including, but not limited to, names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers and medical information such as dates of service, medical record numbers, healthcare provider names, diagnosis/treatment information, medical billing/claims information, patients' facility associated account/encounter numbers, and health insurance information.[9]

18.     As a direct and proximate result of Defendant's failure to implement and to follow basic security procedures, Plaintiffs' and Class Members' PII and PHI is now in the hands of cybercriminals.

19.     Plaintiffs and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy and similar forms of criminal mischief, risk which may last for the rest of their lives.

20.     Consequently, Plaintiffs and Class Members must devote substantially more time, money and energy to protect themselves, to the extent possible, from these crimes. *See McMorris v. Lopez*, 995 F.3d 295, 301 (2d Cir. 2021) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database and steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities.")).

---

[9]     *Notice of Data Security Incident*, *supra* note 5.

21.     Plaintiffs, on behalf of themselves and all others similarly situated, therefore bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment and declaratory judgment. Plaintiffs seek damages and injunctive relief, including the adoption of reasonably necessary and appropriate data security practices to safeguard the Private Information in Defendant's custody in order to prevent incidents like the Data Breach from occurring in the future.

## PARTIES

22.     Plaintiff Leeroy Perkins is an adult who, at all relevant times, was a resident and a citizen of the State of Washington. Since approximately 2003, Plaintiff Perkins has been a patient of Virginia Mason Franciscan Health, a hospital currently in Defendant's network. Plaintiff Perkins received a Data Breach notification informing him that his Private Information had been compromised in the Data Breach.

23.     Since the announcement of the Data Breach, Plaintiff Perkins has been required to spend his valuable time monitoring his various accounts and changing his account passwords in an effort to detect and prevent any misuses of his Private Information—time which he would not have had to expend but for the Data Breach.

24.     As a result of the Data Breach, Plaintiff Perkins will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

25.     Plaintiff Marcia Jacobs is an adult who, at all relevant times, is a resident and citizen of the State of Washington. Between approximately 2012 through 2021, Plaintiff Jacobs was a patient of Virginia Mason Franciscan Health, a healthcare provider currently in Defendant's network. Plaintiff Jacobs received a Data Breach notification informing her that her Private Information she provided to Defendant had been compromised in the Data Breach. Plaintiff Jacobs

likewise received a Data Breach notice informing her that her minor daughter's Private Information she provided to Defendant had been compromised in the Data Breach.

26. Since the announcement of the Data Breach, Plaintiff Jacobs has received a significant increase in the number of spam calls and texts. Plaintiff Jacobs noticed that this was a considerable increase from the amount of spam calls and texts she received prior to receiving a Data Breach notification. Plaintiff Jacobs has also been required to spend her valuable time monitoring her various accounts in an effort to detect and prevent any misuses of her PII and PHI and that of her minor daughter—time which she would not have had to expend but for the Data Breach.

27. As a result of the Data Breach, Plaintiff Jacobs will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

28. Plaintiff Jose Antonio Koch is an adult who, at all relevant times, was a resident and a citizen of the State of Washington. Since approximately April of 2022 Plaintiff Jose Antonio Koch has been a patient of St. Michael Medical Center, a hospital currently in Defendant's network. Plaintiff Koch received a Data Breach notification informing him that his Private Information he provided to Defendant had been compromised in the Data Breach.

29. Since the initial announcement of the Data Breach, Plaintiff Koch has been required to spend his valuable time monitoring his accounts and credit reports in an effort to detect and to prevent any misuses of his Private Information—time which he would not have had to expend but for the Data Breach.

30. As a result of the Data Breach, Plaintiff Koch will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

31.     Plaintiff John Doe is a minor who, at all relevant times, is a resident and a citizen of the State of Washington. Plaintiff John Doe brings this suit by and through his father and legal guardian, Plaintiff Koch, who, at all relevant times, was a resident and a citizen of the State of Washington.

32.     Since approximately May of 2019, Plaintiff John Doe has been a patient of St. Michael Medical Center, a hospital currently in Defendant's network. Plaintiff Koch received a Data Breach notification informing him that Plaintiff John Doe's Private Information he provided to Defendant had been compromised in the Data Breach.

33.     Since the initial announcement of the Data Breach, Plaintiff Koch has been required to spend his valuable time monitoring Plaintiff John Doe's accounts and credit reports in an effort to detect and to prevent any misuses of Plaintiff John Doe's Private Information—time which he would not have had to expend but for the Data Breach.

34.     As a result of the Data Breach, Plaintiff John Doe will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

35.     Plaintiff James Doe is a minor who, at all relevant times, is a resident and a citizen of the State of Washington. Plaintiff James Doe brings this suit by and through his father and legal guardian, Plaintiff Koch, who, at all relevant times, was a resident and a citizen of the State of Washington.

36.     Since approximately November of 2019 Plaintiff James Doe has been a patient of St. Michael Medical Center, a hospital currently in Defendant's network. Plaintiff Koch received a Data Breach notification informing him that Plaintiff James Doe's Private Information he provided to Defendant had been compromised in the Data Breach.

8

37.     Since the initial announcement of the Data Breach, Plaintiff Jose Antonio Koch has been required to spend his valuable time monitoring Plaintiff James Doe's accounts and credit reports in an effort to detect and to prevent any misuses of Plaintiff James Doe's Private Information—time which he would not have had to expend but for the Data Breach.

38.     As a result of the Data Breach, Plaintiff James Doe will continue to be at heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

39.     Defendant CommonSpirit Health is a Colorado not-for-profit corporation with a principal place of business located at 444 W. Lake Street, Suite 2500, in Chicago, Illinois 60606. Defendant is a citizen of Illinois.

## JURISDICTION & VENUE

40.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

41.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District.

42.     Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper because Defendant resides in this judicial district, and a substantial portion of the events giving rise to Plaintiffs' claims occurred or emanated from this judicial district.

**FACTUAL BACKGROUND**

**A.     CommonSpirit & the Services It Provides.**

43.     CommonSpirit touts itself as "one of the largest nonprofit health systems in the U.S., with more than 1,000 care sites in 21 states coast to coast, serving 20 million patients in big cities and small towns across America."[10]

44.     While providing healthcare services, Defendant receives, creates and handles an incredible amount of Private Information, including, *inter alia*, names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers and medical information such as dates of service, medical record numbers, healthcare provider names, diagnosis/treatment information, medical billing/claims information, patients' facility associated account/encounter numbers and health insurance information.

45.     Patients are required to provide and to otherwise entrust their PII and PHI to Defendant to receive healthcare services and, in return, they reasonably and appropriately expect that CommonSpirit will safeguard their highly sensitive Private Information and keep it secure and confidential.

46.     Even though CommonSpirit supposedly "understand[s] that [patients] protected health information is private and personal" and it professes to be "committed to protecting it,"[11] it nevertheless employed inadequate data security measures to protect and to secure the Private Information of its patients.

---

[10]     *Building     a     nation     of     Healthy     Communities*,     CommonSpirit, https://www.commonspirit.org/ (last visited Apr. 20, 2023).

[11]     *Notice     of     Privacy     Practices*,     Virginia     Mason     Franciscan     Health, https://www.vmfh.org/content/dam/vmfhorg/pdf/vmfh-npp-english.pdf (last updated June 2022).

47. CommonSpirit's actions and inactions directly resulted in the Data Breach and the compromise of Plaintiffs' and Class Members' Private Information.

**B.      CommonSpirit Knew the Risks of Storing Valuable Private Information & the Foreseeable Harm to Victims.**

48. CommonSpirit was well aware that Private Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

49. CommonSpirit also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Private Informationwas compromised, as well as intrusion into their highly private health information.

50. These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

51. PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[12]

52. PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[13]

---

[12]      Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[13]      *See* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

53.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses and government entities.

54.     In 2021 alone, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[14]

55.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years; for instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[15]

56.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[16]

57.     Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[17]

---

[14]     *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[15]     *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Apr. 20, 2023).

[16]     *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Apr. 20, 2023).

[17]     *Id.*

58. Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[18]

59. The healthcare sector suffered about 337 breaches in the first half of 2022 alone according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[19]

60. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

61. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[20]

---

[18] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited Apr. 20, 2023).

[19] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[20] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

62.     A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1.[21] According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[22]

63.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark]

---

[21]     *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf  (last visited Apr. 20, 2023).

[22]     Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[23]

64.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

65.     Based on the value of its patients' PII and PHI to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

**C.     CommonSpirit Breached its Duty to Protect its Patients' Private Information.**

66.     On October 2, 2022, CommonSpirit detected activity on its IT network that it later determined to be ransomware.[24]

67.     On October 4, 2022, CommonSpirit announced that it was managing an IT security issue that was impacting some of its facilities and took certain IT systems, which may have included electronic health records, offline.[25]

---

[23]     U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 20, 2023).

[24]     *Notice of Data Security Incident*, *supra* note 5.

[25]     *CommonSpirit Update*, CommonSpirit Health (Oct. 4, 2022), https://www.commonspirit.org/update/10-4-2022 (Defendant has since removed this page from its Website).

68.     On October 5, 2022, CommonSpirit announced that it had identified the IT security issue impacting its facilities[26] and later announced on October 17, 2022, that it had been managing a response to a ransomware attack that had impacted some of its facilities.[27]

69.     Following the ransomware attack, Defendant allegedly engaged third-party experts to investigate the nature and scope of the Data Breach.

70.     That investigation determined that between September 16, 2022 and October 3, 2022, an unauthorized third party gained access to, and copied data from, portions of CommonSpirit's computer systems, compromising files that contained personal information, including file share servers that contained individuals' sensitive information.[28]

71.     CommonSpirit then allegedly engaged in a review of the data on the file share servers in order to determine what and whose information was impacted by the Data Breach.[29] This phase of Defendant's investigation was completed on or about February 21, 2023.[30]

---

[26]     *CommonSpirit Update*, CommonSpirit Health (Oct. 5, 2022), https://www.commonspirit.org/update/10-5-2022 (Defendant has since removed this page from its Website).

[27]     *CommonSpirit Update*, CommonSpirit Health (Oct. 17, 2022), https://www.commonspirit.org/update/10-17-2022 (Defendant has since removed this page from its Website).

[28]     *Notice of Data Security Incident*, *supra* note 5.

[29]     *Id.*

[30]     *Id.*

72.     Even though Defendant did not finish reviewing the impacted files until on or around February 21, 2023, CommonSpirit initially began notifying patients impacted by the Data Breach on or around December 1, 2022.[31]

73.     The December 2022 notice was limited to patients who received healthcare services at Defendant's affiliates Franciscan Medical Group and/or Franciscan health in Washington State and indicated that the compromised information included names, addresses, phone numbers, dates of birth, and inquire IDs used internally by CommonSpirit of patients, family members of patients, and caregivers of patients.[32]

74.     Thus, Defendant initially mislead its patients to believe that only CommonSpirit's Washington-based operations were impacted by the Data Breach.

75.     As the months went on, Defendant slowly began to admit that the Data Breach was much broader in scope than it initially led its patients to believe.

76.     On or around February 9, 2023, CommonSpirit notified individuals at one of its joint ventures, DHC, that their personal information had also been compromised during the Data Breach.[33]

77.     At this point, CommonSpirit indicated the information impacted by the Data Breach also included "personal information of some patients, patient guarantors, and some staff or credentialed practitioners of DHC."[34]

---

[31]     *Id.*

[32]     *Id.*

[33]     *Id.*

[34]     *Id.*

78. Nonetheless, at that time CommonSpirit still failed to disclose the true size of the Data Breach, again misleading patients to believe that only its DHC and Washington-based operations were impacted by the Data Breach.

79. Not until April 6, 2023, approximately *six months after initially discovering the Data Breach*, did CommonSpirit admit that the Data Breach was much more widespread and severe than it initially reported.[35]

80. Specifically, on April 6, 2023, Defendant announced that the Data Breach impacted 164 hospitals and care centers around the country.[36]

81. Defendant further acknowledged that the information compromised in the Data Breach included individuals' names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers, and medical information such as dates of service, medical record numbers, healthcare provider names, diagnosis/treatment information, medical billing/claims information, patients' facility associated account/encounter numbers, and health insurance information.[37]

82. Despite the Data Breach compromising a broad swath of Private Information that can be used to commit fraud by bad actors with nefarious intent, CommonSpirit has not offered those patients impacted by the Data Breach identity theft or restoration services. Instead, CommonSpirit put the onus on Plaintiffs and Class Members to protect themselves from Defendant's failures to implement adequate data security measures. Indeed, in CommonSpirit's

---

[35]     *Id.*

[36]     HIPAA Journal, *supra* note 8.

[37]     *Notice of Data Security Incident*, *supra* note 5.

18

notice to patients, Defendant explained that "it is always prudent to review health care statements for accuracy and report any services or charges that were not incurred to the provider or insurance carrier" under a heading title "What you can do."[38]

83.     In addition to compromising patient PII and PHI, the Data Breach interrupted access to electronic medical records across Defendant's facilities and delayed patient care in multiple regions of the United States.[39]

84.     Indeed, it took CommonSpirit more than a month to return to normal operations after discovering the Data Breach.[40]

85.     In the end, the impact of the Data Breach cost CommonSpirit $150 million in lost revenue due to its business disruption and the extra costs required to fix the related IT issues.[41]

86.     The cost of the Data Breach is one of the largest ever seen in healthcare. According to IBM, the average cost of a healthcare data breach is approximately $10.1 million.[42]

---

[38]     *Id.*

[39]     Samantha Liss, *CommonSpirit Continues to Wrangle with Cyberattack*, HealthCareDive (Nov. 11, 2022), https://www.healthcaredive.com/news/commonspirit-cyberattack-continues/636337/.

[40]     Rebecca Pifer, *Scope of CommonSpirit Data Breach Larger than Initially Disclosed*, HealthCareDive (Apr. 10, 2023), https://www.healthcaredive.com/news/scope-commonspirit-data-breach-larger/647198/.

[41]     Laura Dydra, *CommonSpirit took $150M hit from ransomware attack*, BECKER'S HEALTH IT (Feb. 16, 2023), https://www.beckershospitalreview.com/cybersecurity/commonspirit-took-150m-hit-from-ransomware-attack.html.

[42]     Jessica Davis, *CommonSpirit Health Cyberattack, Month-Long Network Outage Cost $150M*, SC Media (Feb. 15, 2023), https://www.scmagazine.com/news/ransomware/commonspirit-health-cyberattack-network-outage-cost-150m.

87. On December 1, 2022, approximately two months after first discovering the Data Breach, Defendant reported the Data Breach to the HHS.

88. On or about the same date that Defendant reported the Data Breach to HHS, Defendant provided notice to Plaintiffs indicating that their PII and PHI may have been compromised or accessed during the Data Breach.

89. Like Plaintiffs, the Class Members received similar notices informing them that their PII and/or PHI was exposed in the Data Breach.

90. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect its patients' PII and PHI.

**D. CommonSpirit is Obligated Under HIPAA to Safeguard Private Information.**

91. CommonSpirit is required by HIPAA to safeguard patient PHI.

92. CommonSpirit is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

93. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

94. Further to 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

95. Under C.F.R. 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health

20

care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

96.     HIPAA requires CommonSpirit to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et. seq*.

97.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."[43]

98.     While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiffs or the Class Members consent to the disclosure of their PHI to cybercriminals.

99.     As such, CommonSpirit is required under HIPAA to maintain the strictest confidentiality of Plaintiffs' and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

---

[43]     *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

100. Given the application of HIPAA to CommonSpirit, and that Plaintiffs and Class Members entrusted their PHI to Defendant in order to receive healthcare services, Plaintiffs and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**E. FTC Guidelines Prohibit CommonSpirit from Engaging in Unfair or Deceptive Acts or Practices.**

101. CommonSpirit is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

102. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[44]

103. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[45]

104. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords

---

[44] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[45] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[46]

105. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

106. CommonSpirit failed to properly implement basic data security practices. CommonSpirit's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

107. CommonSpirit was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.     The Monetary Value of Private Information.**

108. As a result of Defendant's failures, Plaintiffs and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information.

109. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those

---

[46]     *Id.*

affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[47]

110.    With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[48]

111.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[49]

112.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[50]

113.    Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web.

---

[47]    Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Apr. 20, 2023).

[48]    Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HealthITSecurity, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited Apr. 20, 2023).

[49]    *Id.*

[50]    Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited April 20, 2023).

114. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[51]

115. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[52]

116. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[53]

---

[51] *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited April 20, 2023).

[52] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[53] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

117.     Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[54] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information.  And, by making the transaction transparent, consumers will make a profit from their Private Information.  This business has created a new market for the sale and purchase of this valuable data.

118.     Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[55]

119.     The value of Plaintiffs' and Class members' Private Information on the black market is substantial. Sensitive health information can sell for as much as $363.[56]

120.     This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[54]     Angwin & Steel, *supra* note 52.

[55]     *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf.

[56]     Center for Internet Security, *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

121. Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[57]

122. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[58]

123. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[59]

124. The Federal Trade Commission has warned consumers of the dangers of medical identity theft, stating that criminals can use personal information like a "health insurance account number or Medicare number" to "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." The FTC further warns that

---

[57] *Id.*

[58] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Apr. 20, 2023).

[59] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER (Feb. 7, 2014) https://khn.org/news/rise-of-indentity-theft/.

instances of medical identity theft "could affect the medical care you're able to get or the health insurance benefits you're able to use[,]" while also having a negative impact on credit scores.[60]

125.    Here, where health insurance information was among the Private Information impacted in the Data Breach, Plaintiffs' and Class members' risk of suffering future medical identity theft is especially substantial.[61]

126.    The ramifications of CommonSpirit's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for 6 to 12 months or even longer.

127.    Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[62] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[63]

---

[60]    Federal Trade Commission, *What to Know About Medical Identity Theft*, What To Know About Medical Identity Theft | Consumer Advice (ftc.gov) (last visited Apr. 20, 2023).

[61]    *See* American Association of Retired Persons, *Watch for Medical Identity Theft*, https://www.aarp.org/money/scams-fraud/info-11-2010/watch_for_medical_wy.html#:~:text=Medical%20identity%20theft%20is%20when%20someone%20uses%20your,You%20can%20be%20harmed%20by%20medical%20identity%20theft (last visited April 20, 2023).

[62]    *See Medical ID Theft Checklist*, IDENTITYFORCE, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited April 20, 2023).

[63]    *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches*, EXPERIAN, (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

128. Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[64]

129. Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft, including medical identity theft, have a crippling effect on individuals and detrimentally impact the economy as a whole.[65]

130. At all relevant times, Defendant was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft (including medical identity theft) and fraud.

131. Upon information and good faith belief, had Defendant remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it would have prevented the ransomware attack into its systems and, ultimately, the theft of the Private Information of patients within its systems.

132. The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an

---

[64] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.

[65] *Id.*

29

individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.

133.    Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[66] For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[67]

134.    Based upon information and belief, the unauthorized parties have already utilized, and will continue utilize, the Private Information they obtained through the Data Breach to obtain additional information from Plaintiffs and Class members that can be misused.

135.    In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

136.    Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

137.    Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access

---

[66]    *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

[67]    *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

138. Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

139. In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

**G.      Plaintiffs & Class Members Have Suffered Compensable Damages.**

140. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways.

141. The risks associated with identity theft, including medical identity theft, are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds to thousands of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

142. In order to mitigate against the risks of identity theft and fraud, Plaintiffs and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable

31

identity theft protection and credit monitoring services, and pay to procure them. Indeed, in its Data Breach notification Defendant advised Plaintiff and Class Members to "review health care statements for accuracy and report any services or charges that were not incurred to the provider or insurance carrier."[68]

143.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

144.    Further, the value of Plaintiffs and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

145.    Plaintiffs and Class Members now face a greater risk of identity theft, including medical identity theft.

146.    Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

147.    Plaintiffs and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

148.    Plaintiffs and Class Members also did not receive the full benefit of their bargain when paying for medical services. Instead, they received services of a diminished value to those described in their agreements with Defendant. Plaintiffs and Class Members were damaged in an

---

[68]    *Notice of Data Security Incident*, *supra* note 5.

amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

149. Plaintiffs and Class Members would not have obtained services from CommonSpirit had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Private Information from criminal theft and misuse.

150. Finally, in addition to a remedy for the economic harm, Plaintiffs and Class members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

**CLASS ALLEGATIONS**

151. Plaintiffs bring this class action on behalf of themselves and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

152. Plaintiffs seek to represent a class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the CommonSpirit Data Breach which was discovered on or about October 2, 2022 (the "Class").

153. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

154. This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

33

155.    **Numerosity:** Plaintiffs are informed and believe, and thereon allege, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 623,000 individuals.

156.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a.      Whether Defendant failed to timely notify Plaintiffs and Class Members of the Data Breach;

b.      Whether Defendant had a duty to protect the PII and PHI of Plaintiffs and Class Members;

c.      Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' PII and PHI, and breached its duties thereby;

d.      Whether Defendant entered into an implied contract with Plaintiffs and Class Members;

e.      Whether Defendant breached that contract by failing to adequately safeguard Plaintiffs' and Class Members' PII and PHI;

f.      Whether Defendant was unjustly enriched;

g.      Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h.      Whether Plaintiffs and Class Members are entitled to declaratory judgment due to Defendant's wrongful conduct.

157.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class were all

patients, or family members or caregivers of patients, of Defendant, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

158. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and have no interests antagonistic to the members of the Class. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical as explained above.

159. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

160. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

161. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23 (b)(2).

162. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiffs & the Class)**

163. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

164. Plaintiffs bring this claim individually and on behalf of the Class.

165. Defendant owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

166. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

167. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

168. Defendant's duty also arose from Defendant's position as a healthcare provider. Defendant holds itself out as a trusted provider of healthcare, and thereby assumes a duty to

36

reasonably protect its patients' information. Indeed, Defendant was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

169. Defendant breached the duties owed to Plaintiffs and Class Members and thus was negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiffs' and Class Members' PII and PHI, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

170. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII and PHI would not have been compromised.

171. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries, including:

       a.     Theft of their PII and/or PHI;

b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.   Costs associated with purchasing credit monitoring and identity theft protection services;

d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.   Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i.   Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members;

j.   The diminished value of the services they paid for and received and

k.   Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

172.   As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs & the Class)**

173. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

174. Plaintiffs bring this claim individually and on behalf of the Class.

175. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

176. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of a data breach involving PII and PHI of its patients.

177. Plaintiffs and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

178. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

179. CommonSpirit is an entity covered under HIPAA which sets minimum federal standards for privacy and security of PHI.

180. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiffs' and the Class Members' electronic PHI.

181. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and

39

protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

182. Defendant violated HIPAA by actively disclosing Plaintiffs' and the Class Members' electronic PHI and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI.

183. Plaintiffs and the Class Members are patients within the class of persons HIPAA was intended to protect.

184. Defendant's violation of HIPAA constitutes negligence *per se*.

185. The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

186. As a direct and proximate result of Defendant's negligence, Plaintiffs' and Class Members have been injured as described herein and in Paragraph 96 above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs & the Class)

187. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

188. Plaintiffs bring this claim individually and on behalf of the Class.

189. When Plaintiffs and Class Members provided their PII and PHI to CommonSpirit, they entered into implied contracts with Defendant, under which Defendant agree to take

40

reasonable steps to protect Plaintiffs' and Class Members' PII and PHI, comply with its statutory and common law duties to protect Plaintiffs' and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

190. CommonSpirit solicited and invited Plaintiffs and Class Members to provide their PII and PHI as part of Defendant's provision of healthcare services. Plaintiffs and Class Members accepted Defendant's offers and provided their PII and PHI to Defendant.

191. Implicit in the agreement between Plaintiffs and Class Members and CommonSpirit, was Defendant's obligation to: (a) use such PII and PHI for business purposes only; (b) take reasonable steps to safeguard Plaintiffs' and Class Members' PII and PHI; (c) prevent unauthorized access and/or disclosure of Plaintiffs' and Class Members' PII and PHI; (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or disclosure of their PII and PHI; (e) reasonably safeguard and protect the PII and PHI of Plaintiffs and Class Members from unauthorized access and/or disclosure; and (f) retain Plaintiffs' and Class Members' PII and PHI under conditions that kept such information secure and confidential.

192. When entering into implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class Members' PII and PHI and to timely notify them in the event of a data breach.

193. Plaintiffs and Class Members paid money to Defendant in exchange for services, along with Defendant's promise to protect their PII and PHI from unauthorized access and disclosure. Plaintiffs and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. CommonSpirit failed to do so.

194. Plaintiffs and Class Members would not have provided their PII and PHI to CommonSpirit had they known that Defendant would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

195. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

196. CommonSpirit breached its implied contracts with Plaintiffs and Class Members by failing to safeguard their PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach

197. The losses and damages Plaintiffs and Class Members sustained, include, but are not limited to:

     a.    Theft of their PII and/or PHI;

     b.    Costs associated with purchasing credit monitoring and identity theft protection services;

     c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

     d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

     e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

     f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

     g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding

that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

198. As a direct and proximate result of CommonSpirit's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

199. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (1) strength its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) immediately provide and continue to provide adequate credit monitoring to Plaintiffs and all Class Members.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs & the Class)**

200. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

201. Plaintiffs bring this claim individually and on behalf of the Class in the alternative to the Third Cause of Action above.

43

202. Upon information and belief, Defendant funds its data security measures from its general revenue including payments made by or on behalf of Plaintiffs and Class Members.

203. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

204. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased healthcare services from Defendant and/or its agents and in so doing provided Defendant with their PII and PHI.

205. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII and PHI protected with adequate data security.

206. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiffs and Class Members for business purposes.

207. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members PII and PHI. Instead of providing a reasonable level of data security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits and the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective data security measures.

208. Under the principles of equity and good conscience, CommonSpirit should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

209. Defendant failed to secure Plaintiffs and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members conferred upon CommonSpirit.

210. Defendant acquired Plaintiffs' and Class Members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

211. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

212. Plaintiffs and Class Members have no adequate remedy at law.

213. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered injuries, including:

    a. Theft of their PII and/or PHI;

    b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c. Costs associated with purchasing credit monitoring and identity theft protection services;

    d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

    g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members'

45

data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

i. Future costs in terms of time, effort, and money that will be expended as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members;

j. The diminished value of the services they paid for and received; and

k. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

214. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

215. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs & the Class)**

216. Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

217. Plaintiffs bring this claim individually and on behalf of the Class.

218.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

219.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff's and Class Members from further data breaches that compromise their PII and PHI. Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and PHI and remains at imminent risk that further compromises of their PII and PHI will occur in the future.

220.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.     Defendant owes a legal duty to secure patients' PII and PHI and to timely notify patients of a data breach under the common law, Section 5 of the FTC Act, and HIPAA; and

    b.     Defendant continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

221.     This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

222.     If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant.

223.     The risk of another such breach is real, immediate and substantial.

224.   If another breach at Defendant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

225.   The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

226.   Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment in their favor and against as CommonSpirit and respectfully request the following relief:

a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

b.   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

c.   For damages in an amount to be determined by the trier of fact;

d.   For an order of restitution and all other forms of equitable monetary relief;

e.   Declaratory and injunctive relief as described herein;

48

f.     Awarding Plaintiffs reasonable attorneys' fees, costs and expenses;

g.     Awarding pre- and post-judgment interest on any amounts awarded; and

h.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Dated: April 20, 2023                                Respectfully submitted,

 */s/ Jamisen A. Etzel*
Gary F. Lynch
Jamisen A. Etzel
Nicholas A. Colella
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
F: (412) 231-0246
gary@lcllp.com
jamisen@lcllp.com
nickc@lcllp.com

Kasif Khowaja
**Khowaja Law Firm, LLC**
8 South Michigan Ave, Suite 2600
Chicago, IL 60603
(312) 566-8070
kasif@khowajalaw.com

David S. Almeida
Elena A. Belov (*pro hac vice forthcoming*)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
david@almeidalawgroup.com
elena@almeidalawgroup.com